COLORADO NATIONAL BANKSHARES, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Colorado Nat'l Bankshares, Inc. v. Commissioner
Docket No. 3273-88
United States Tax Court
T.C. Memo 1990-495; 1990 Tax Ct. Memo LEXIS 548; 60 T.C.M. (CCH) 771; T.C.M. (RIA) 90495; September 17, 1990, Filed *548 Decision will be entered under Rule 155. During 1981 and 1982, petitioner acquired seven banks. In accordance with generally accepted accounting principles, petitioner allocated the purchase price of each bank among the acquired tangible and identifiable intangible assets, with any residual amounts being allocated to goodwill and going-concern value. Petitioner identified "core deposits intangible" as a separately identifiable intangible asset. Petitioner uses the term core deposits intangible to describe the intangible asset that represents the present value of the future stream of net income to be derived from utilizing the core deposits on account on the date a bank is purchased. Petitioner uses the term "core deposits" principally to refer to funds on deposit with an acquired bank in demand deposit accounts, so-called NOW accounts, and regular savings accounts. Held, petitioner proved that its core deposits intangible had an ascertainable value separate and distinct from the goodwill and going-concern value of the acquired banks, and that it had a limited useful life, the duration of which could be ascertained with reasonable accuracy. Petitioner, therefore, is entitled *549 to a depreciation deduction under sec. 167, I.R.C. 1954, with respect to core deposits intangible. Sec. 1.167(a)-3, Income Tax Regs.
Held further, petitioner is entitled to allocate to core deposits intangible an amount equal to the present value of the difference in costs between the acquired core deposits and the market alternative. Held further, petitioner is entitled to depreciation deductions for the taxable years 1982, 1983, and 1984 based on the estimated useful lives and amortization schedules calculated by petitioner and using as the basis for core deposits intangible an amount equal to the present value on the acquisition dates of the difference in costs between the acquired core deposits and the market alternative. Sec. 167(a), I.R.C. 1954. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), followed. James E. Bye, William S. Huff, Douglas A. Pluss, Norvell E. Brasch, and Garth B. Jensen, for the petitioner. William P. Boulet, Jr. and David J. Mungo, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION After concessions, the sole issue for decision is whether petitioner, *550 Colorado National Bankshares, Inc. (CNB), is entitled to depreciate in taxable years 1982, 1983, and 1984 "core deposits intangible" acquired in the purchase of seven banks. Petitioner is a bank holding company holding only the stock of commercial banks and bank-related subsidiaries. Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1973
$ 18,637   1980
$ 3,130,835
1981
$ 289,202  1982
$ 2,274,851
1983
$ 465,693  1984
$ 661,840  We hold that petitioner proved that its core deposits intangible had an ascertainable value separate and distinct from goodwill and going-concern value, and had a limited useful life, the duration of which could be ascertained with reasonable accuracy. Therefore, petitioner is entitled to depreciate core deposits intangible acquired in its purchase of seven banks. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
During the years at issue, petitioner was a Colorado corporation with its principal place of business in Denver, Colorado. Prior to the acquisitions at issue, petitioner owned substantially all of the stock of 13 commercial banks located in Colorado, primarily in the *551 Front Range area. The Front Range is comprised of 10 Colorado counties located near the eastern edge of the Rocky Mountains, in which approximately 80 percent of the population of Colorado resided during the early 1980's. During 1981 and 1982, petitioner acquired all of the outstanding stock of seven banks (the acquired banks), located in the Front Range area of Colorado. The acquired banks, their acquisition dates, purchase prices and adjustments thereto, are as follows: Adjusted
Acquisition
Purchase
Acquired Bank
Date
Price
1. Aurora Mountain Bank
(Aurora)     01/29/82   $ 3,494,143 2. Boulder National Bank
(Boulder)     01/29/82   $ 11,993,077
3. First National Bank of Pueblo
(Pueblo)     01/29/82   $ 22,008,235
4. Ft. Collins National Bank
(Ft. Collins)     01/29/82   $ 3,218,425 5. Park National Bank (Park)
01/29/82   $ 1,854,964 6. Exchange National Bank of
Colorado Springs (Exchange)   10/19/82   $ 39,926,161
7. Arvada State Bank (Arvada)
[1] 11/15/82 [2] *552 $ 6,894,788 At the time of the bank acquisitions, all of the Colorado Front Range communities, except Pueblo, were experiencing an economic boom and significant population growth. 2. Definitions and Banking Industry Background
The term "core deposits" refers to funds on deposit with an acquired bank in the following types of accounts: (i) an interest-free checking account (demand deposit account); (ii) an interest-paying checking account (so-called NOW -- negotiable order of withdrawal -- account); and (iii) a savings account, with or without a passbook. Petitioner treated as core deposits only those funds on deposit in these three types of accounts. The "core deposit mix" refers to the ratio of different types of core deposit accounts. Because each type of deposit account has different interest and operating costs to the bank, a change in the mix of core deposits affects the bank's net interest margin (the interest earned from all interest-earning assets less the interest paid to maintain the interest-earning assets), and therefore its profitability. The term "core deposits *553 intangible" refers to the intangible asset that represents the present value of the future stream of net income to be derived from utilizing the core deposits on account on the date a bank is purchased. As used in this case, "conservative" means: (i) tending to understate rather than overstate value, (ii) tending to produce a slower rate of amortization, or (iii) tending to defer rather than accelerate amortization deductions. In the banking industry, core deposits are one of the most favorable sources of funds because they are relatively low-cost, reasonably stable over time, and relatively insensitive to interest rate changes. A bank can acquire core deposits through marketing efforts to attract depositors. A bank holding company can also acquire core deposits by purchasing an established bank. Banks can also purchase core deposits alone. A bank typically invests the funds from deposits in loans and other income-producing assets, and receives fees for services performed for its depositors. A bank incurs expenses, e.g., payment of interest, and/or the costs associated with the provision of services to depositors, to attract and maintain core deposit accounts. The costs of maintaining *554 core deposit accounts include a portion of the costs of maintaining banking facilities, marketing and advertising expenses, and the costs of providing the variety of services which attract and keep deposit customers. For example, where a customer places a deposit with a bank that has extended credit to the customer, a portion of the costs associated with the extension of credit are also expenses of maintaining that deposit. The excess of the income generated over the associated costs represents the profit attributable to core deposits. That is, the economic value of the core deposits rests upon the ability of the acquiring bank to generate a stream of net income over the useful life of the core deposits. Core deposits are important to the profitability of a commercial bank. If a bank does not have sufficient core deposits, it must fund its investments through funds obtained at a higher interest rate and other sources of funding (known as the market alternative), thereby typically reducing net income. The value to a bank of a core deposit account increases as its expected life increases, and decreases as its expected life decreases. Core deposits intangible would have no value whatsoever *555 in the absence of the expectancy that deposit customers will continue to have deposits at the acquired banks. Noncommercial deposit customers consider a bank's reputation, personnel, and location to be among the most important factors in deciding where to bank. Other factors that affect where an individual will open and maintain a core deposit account include personal relationships with the bank's personnel, the bank's physical facilities, advertising or public relations efforts by the bank, the bank's hours of operations, customer inertia, and the existence of a drive-up or walk-up facility. Among the most important factors enabling a bank to attract and maintain business depositors are the bank's reputation for good service and the quality of its personnel. Although core deposits are liabilities on a commercial bank's balance sheet, core deposits intangible is an asset. That is, petitioner must pay depositors as they withdraw their funds, but until such time, petitioner will be able to invest the funds. Depositors are customers of a bank who can generally withdraw their funds at any time. Deposit accounts do not necessarily remain with a bank indefinitely due to changes in depositor *556 circumstances (such as movement from a bank's service area, dissatisfaction with bank service, or death, divorce, and marriage), bank services, bank reputation, bank condition, government regulation, economic conditions, or increased competition from other financial institutions, among other things. Federal credit enhancements, e.g., the Federal Deposit Insurance Corporation, and the Federal Reserve Bank, enable banks to obtain insured core deposits at lower interest rates than they could through uninsured deposit financing. 3. Petitioner's Acquisitions of the Seven Banks
Petitioner reviewed and considered the level and mix of core deposits of the respective banks in its decision to acquire them. However, there were no specific discussions or negotiations between petitioner and Mountain Banks, Ltd. (MBL), or between petitioner and the owners of Arvada concerning the value of core deposits intangible or other assets at the acquired banks. Petitioner's primary emphasis in analyzing potential acquisition targets was on earnings history and trends at the target banks. Petitioner paid a purchase premium (an amount paid in excess of book value) with respect to each of the acquired banks, *557 as shown below: Purchase
Price Allocated
Acquired Bank
Premium
to CDI
Arvada
$ 3,879,821 $ 2,600,934   Aurora
1,895,049
2,205,901  Boulder
6,907,675
6,326,609  Exchange
23,204,045
16,316,974  Ft. Collins
1,251,887
1,186,825  Park
477,945
1,027,219  Pueblo
11,535,183
11,996,278  Petitioner's vice president and assistant treasurer, Charles Schley, projected earnings growth at each of the acquired banks by generally studying their growth rates for the previous five years. During the period between the execution of the Five Banks [3] and Exchange Purchase Agreements and the closing of the acquisitions, petitioner reviewed core deposit amounts to determine that there was no faster runoff of core deposit accounts than normal over that period of time. To help make this determination, MBL supplied an extensive analysis of the accounts by type, including statistical compilations about lapsing of accounts. a. Arvada State Bank
On February 1, 1981, petitioner purchased all of the outstanding stock of a Colorado bank then known as the Arvada State Bank (Arvada). The purchase *558 price for the Arvada stock was $ 8,135,700 and was arrived at by arm's-length negotiations between unrelated parties. The purchase price of Arvada represented its fair market value and nearly twice its book value as of February 1, 1981. Petitioner made a valid election under section 338 [4] on its consolidated Federal income tax return for 1982 to treat the purchase of the Arvada stock as an asset acquisition as of November 15, 1982. At the time of its purchase, Arvada had a strong core deposit base. It had a better and less expensive mix of core deposits than its competitor banks. The favorable mix of core deposits at Arvada enhanced its profitability. However, at the time of acquisition, petitioner had no specific plans with respect to the tax treatment of the purchased Arvada core deposits intangible. Petitioner amortized the acquired Arvada core deposits intangible over its estimated life under section 167 for taxable years 1982, 1983, and 1984. b. The Five Banks
Petitioner formed five new *559 subsidiary banks, and on January 29, 1982, each of the new banks purchased the outstanding stock [5] of one of five banks (hereinafter Five Banks) owned by MBL. On the same day, each acquired MBL bank was merged into its newly formed CNB bank counterpart, with the result that each newly formed CNB bank acquired all of the assets of an MBL bank, and the five acquired MBL banks ceased to exist. By agreement, the purchase price for the Five Banks was an aggregate price ($ 40,480,668) for the banks' stock, including directors' shares, and the underlying real property. The purchase price of the Five Banks was arrived at by arm's-length negotiations between unrelated parties and represented the aggregate fair market value of such banks at the time they were purchased. CNB based its purchase price for the Five Banks on the earnings stream it expected from the acquired banks. At the time of their acquisition, each of the Five Banks had a good level and mix of core deposits, which had a material impact *560 on the purchase price. On February 2, 1982, the Office of the Comptroller of the Currency (OCC) approved the mergers of the five MBL banks into the CNB interim subsidiary banks, effective January 29, 1982. Bank to be Organized
Acquired MBL Bank
(i)
Colorado National Bank of Aurora
Aurora Mountain Bank
(ii)
First National Interim Bank of
First National Bank
Pueblo        of Pueblo
(iii)
Park Interim National Bank
Park National Bank
(iv)
Ft. Collins Interim National Bank
Ft. Collins Bank
(v)
Boulder Interim National Bank
Boulder National Bank
As a result of the stock purchase and merger, pursuant to section 334(b)(2), each interim bank was treated as if it had purchased all of the assets of the acquired MBL bank. Section 334(b)(2) required that the purchase price for the stock be allocated among all of the assets purchased. The Five Banks Purchase Agreement did not state values for any assets of the Five Banks because MBL was advised that it would incur substantial adverse tax consequences if the agreement contained an allocation of purchase price among the acquired assets. CNB preferred to purchase assets rather than stock, but MBL would only sell the assets of the Five Banks if CNB agreed to pay *561 added purchase price equal to the additional amounts incurred by MBL for adverse income tax consequences arising from a sale of assets rather than stock. However, MBL allowed petitioner and its outside experts, including the accounting firm Ernst & Whinney (E & W), access to the records and physical property of the Five Banks in order to value the assets following the execution of the five Banks Purchase Agreement. Prior to the execution of the Five Banks Purchase Agreement, CNB reviewed three years of publicly available MBL reports filed with regulatory authorities: (i) Call Reports for each of the Five Banks, (ii) Federal Reserve System Y-6 Annual Reports of Condition of Bank Holding Companies, and (iii) Securities and Exchange Commission reports. CNB also analyzed three years of MBL internal management reports. In addition, CNB reviewed five years of operating data consisting of independent auditors' reports of the Five Banks, and interim financial information. Officers of MBL answered questions and supplied much additional information. After these mergers, new books were set up for each of the newly organized CNB banks. For financial accounting, regulatory, and tax purposes, *562 each asset of the acquired bank was recorded at its estimated fair market value on the date of the acquisition. Each bank recognized the acquisition of core deposits intangible. The respective values of the core deposits intangible of the Five Banks were determined by CNB prior to the closing on the Five Banks and based entirely on preacquisition data. Each of the five newly organized CNB banks claimed depreciation deductions under section 167 over the estimated life of the acquired core deposits intangible for its taxable years 1982, 1983, and 1984. c. Exchange Bank
On June 16, 1982, the OCC granted preliminary approval to organize CNB-Colorado Springs as an interim national bank. On October 19, 1982, a newly formed subsidiary of petitioner purchased all of the outstanding stock of another bank owned by MBL, Exchange National Bank of Colorado Springs (Exchange). The interim subsidiary bank, CNB-Colorado Springs, purchased the Exchange stock, including directors' shares, for $ 38,800,000. The purchase price was arrived at by arm's-length negotiations between unrelated parties and represented the fair market value of Exchange at the time it was purchased. On the same day, Exchange *563 was merged into CNB-Colorado Springs, with the result that CNB-Colorado Springs acquired all of the assets of Exchange, and Exchange ceased to exist. On November 1, 1982, the OCC issued a certificate stating that the merger of Exchange into CNB-Colorado Springs was approved August 31, 1982, effective as of October 20, 1982. The certificate provided for the operation of the resulting bank under the title "Colorado National Bank-Exchange" (CNB - Exchange). CNB used the same procedure and criteria in determining a purchase price for Exchange as it did for the Five Banks. The Exchange Purchase Agreement did not set forth separate values for any of the assets of Exchange because MBL was advised there would be substantial adverse tax consequences if the agreement contained an allocation of the purchase price to and among the acquired assets. However, after the execution of the Exchange Purchase Agreement, and before the closing, MBL allowed petitioner and its outside experts access to the records and physical property of Exchange in order to value its assets. Prior to entering into the Exchange Purchase Agreement, CNB had available all of the same types of information with respect to Exchange *564 that it had received with respect to Five Banks prior to executing the Five Banks Purchase Agreement. As a result of the stock purchase and merger, CNB - Exchange was treated as if it purchased all of the assets of Exchange pursuant to section 334(b)(2). After this merger, CNB - Exchange set up new books. For financial accounting, regulatory, and tax purposes each asset of Exchange was recorded at its estimated fair market value on the date of the acquisition. CNB-Exchange recognized the acquisition of core deposits intangible. At the time of its acquisition, Exchange had an attractive mix of core deposits, and a good level of core deposits. CNB - Exchange amortized the acquired core deposits intangible over its estimated life under section 167 for its taxable years 1982, 1983, and 1984. The value of the Exchange core deposits intangible was calculated prior to the closing for Exchange and was based entirely on preacquisition data. 4. Valuation of the Assets and Allocation of Purchase Price Among the Assets
a. The Five Banks and Exchange
Under generally accepted accounting principles, regulatory accounting principles, and section 334(b)(2), petitioner allocated on its books the *565 purchase price of each of the Five Banks and Exchange among the assets and liabilities of each. Petitioner valued all assets and liabilities of the Five Banks and Exchange at their fair market values. The assets and liabilities of the Five Banks were valued as of January 29, 1982, the closing date of the Five Banks acquisition. Similarly, the assets and liabilities of Exchange were valued as of October 19, 1982, the closing date of the Exchange acquisition. Petitioner determined the purchase price to be allocated to each of the Five Banks since the purchase agreement did not allocate the aggregate purchase price among the individual banks. E & W prepared a report summarizing the fair market values used for the assets and liabilities, and the methodology used to calculate those values and allocate the purchase price among the assets and liabilities of Exchange and each of the Five Banks. The report lists the amount by which the basis of each asset or liability recorded on the books was to be increased or decreased in order to adjust the asset or liability to the fair market value used. The fair market values used by petitioner for the assets and liabilities of each of the Five Banks *566 and Exchange were entered on the books established for each of the post-acquisition banks within a few days after the closings. The value of the acquired core deposits intangible, as well as the other assets and liabilities, recorded on the books of the Five Banks and Exchange was the same for financial and regulatory accounting, and for tax purposes, except that a reserve for loan loss was included on the financial books but recaptured on the tax books. b. Arvada
Petitioner elected to allocate the purchase price of Arvada among its assets and liabilities based on their fair market values pursuant to section 338. Under section 338, the assets and liabilities were valued as of November 15, 1982, the date of the section 338 election. Arvada's financial books recorded the bases of the assets and liabilities at their historic book values, whereas fair market value was used on Arvada's tax books. Petitioner, with the assistance of E & W, prepared a report summarizing the fair market values and the methodology used to compute the values of Arvada's assets and liabilities. This report lists the amount by which the basis of a specified asset or liability recorded on the books of Arvada *567 was to be increased or decreased to adjust the asset or liability to its fair market value. After its section 338 election, Arvada recorded core deposits intangible on its books for tax accounting purposes. Arvada did not change its financial books to reflect the acquisition and subsequent amortization of the acquired core deposits intangible because petitioner believed that it was immaterial to its financial statement. c. Valuation of Assets and Liabilities of the Acquired Banks
Petitioner employed experts to appraise the assets of the acquired banks. For example, experts appraised the acquired banks' real estate and leaseholds, securities portfolios, and furniture, fixtures, and equipment. Petitioner engaged E & W to determine the fair market value of the core deposits intangible of each acquired bank and to calculate the fair market value of the loan portfolios of the Five Banks and Exchange. The method used by E & W is described further below. E & W, and petitioner with respect to Arvada, determined the fair market values of the acquired banks' loan portfolios by calculating the differential between the stated rate of interest on the loans and the rate of interest at which *568 loans of similar type and maturity date were being made at the time of the acquisitions. The interest differential was discounted over the remaining life of the loans to determine the fair market values of the loan portfolios. The book value of each of the Five Banks and Exchange's loan portfolio was larger than its fair market value on the date of the bank's acquisition. The fair market values of the securities portfolios of the acquired banks were determined by reference to published market prices for the individual securities. The fair market values of the real property and leasehold interests owned by the acquired banks were determined by an independent real estate appraiser. The fair market values of the acquired banks' furniture, fixtures, and equipment were also determined by an independent appraiser. The fair market values of the liabilities of the acquired banks were determined by comparing the liabilities to current market instruments of a similar type and nature. d. Allocation of Value to Core Deposits Intangible
Petitioner engaged E & W in the late summer or early fall of 1981 to determine the values of the respective core deposits intangible to be purchased. E & W *569 coordinated the allocation project for the Five Banks. E & W attempted to assign fair market value to all acquired assets of each acquired MBL bank, including core deposits intangible. E & W performed its asset valuations for the six MBL banks once their purchase prices were determined. Petitioner, with assistance from E & W, prepared the allocation report for Arvada after the date of its acquisition. A determination of value was made for each core deposit account at each acquired bank. These were then added to arrive at the aggregate values of core deposits intangible shown in the allocation reports. Petitioner allocated the purchase price of each acquired bank first to assets (other than goodwill and core deposits intangible), liabilities, and shareholder's equity. Petitioner then allocated to core deposits intangible unallocated purchase price to the extent any remained. Lastly, petitioner allocated the remaining, if any, unallocated purchase price to goodwill. The values computed for and amounts allocated to core deposits intangible and goodwill with respect to the acquired banks are as follows: Value of core
Allocation by
deposits intan-
CNB to core
Allocation
Acquired
gible computed
deposits
by CNB
Bank
by CNB
intangible
to goodwill
Arvada
$ 7,939,000    $ 2,600,934  $ - 0 -      Aurora
2,205,901   2,205,901 107,815  Boulder
6,326,609   6,326,609 127,117  Pueblo
12,509,974   11,996,278 - 0 -  Ft. Collins
1,186,825   1,186,825 169,628  Park
1,027,219   1,027,219 29,098  Exchange
16,316,974   16,316,974 5,317,429  Petitioner's *570 allocations to core deposits intangible exceeded the purchase premiums paid for Aurora, Park, and Pueblo that occurred because their other assets and liabilities were valued below book value, leaving more of the purchase price available for allocation to core deposits intangible. Petitioner reduced the allocations made to core deposits intangible at Arvada and Pueblo because its value exceeded the remaining purchase prices available after allocations were made to the other assets and liabilities. These reductions were made with respect to demand deposit accounts only. Present value calculations of the expected income stream of each core deposit account were made as follows: Average account balance - Federal Reserve Bank reserve requirements
= Net investable balance X Estimated rate of return on investments (Funds Revenue Rate)
= Annual Revenue - Interest paid (if any) on the account - Estimated net cost of servicing the account
= Annual Net Income X Discount factor (based on the "weighted average remaining life" of the account and the percentage discount rate determined by management)
= Discounted Net-Income Stream e. Allocation of Goodwill to the Acquired Banks
Petitioner used the *571 residual method to determine the amount of goodwill, if any, allocable to each of the acquired banks. Under this method, the value of, and the purchase price allocated to, goodwill is the balance of the purchase price remaining, if any, after amounts have been allocated to the liabilities and all other assets of the acquired bank. After the purchase price for each acquired bank was allocated among its assets and liabilities (based on their fair market values), the residual amounts remaining were: Acquired Bank
Residual Amount
Aurora   $ 107,815     Boulder   127,117   Pueblo   -0-     Ft. Collins   169,628   Park   29,098   Exchange   5,317,429   Arvada   -0-     There was no residual, and consequently no allocation made, for Pueblo and Arvada because the total fair market value of their assets and liabilities exceeded their respective purchase prices. Accordingly, the value of both Pueblo and Arvada's core deposits intangible was reduced so that the aggregate value (net of identifiable liabilities) of the core deposits intangible and assets other than goodwill equaled the Pueblo and Arvada purchase prices. 5. Petitioner's Core Deposits Intangible Valuation Methodology/Valuation *572 Formula
Dale Winter, CPA, was a partner of E & W and the director of petitioner's core deposits intangible valuation project. He had a number of years experience in performing specialized consulting projects for financial institutions, although he had not valued other core deposits intangible prior to this project for petitioner. In formulating and implementing the methodology used to value the acquired core deposits intangible, Winter received guidance from members of E & W's Chicago office who had previously valued core deposits intangible. E & W also employed actuaries to assist in projecting the lives of the acquired core deposits. In general, E & W's method of valuing core deposits intangible attempted to measure the present value of the net income stream expected from investment of acquired core deposit accounts, minus interest expense, if any, and net service costs associated with those accounts. E & W considered only the core deposit accounts existing on the acquisition date and calculated the revenue to be generated by the average or current balance of those accounts as of a certain date before the acquisition. In determining the value of the acquired core deposits intangible, *573 E & W did not include the income generated by internal accounts, i.e., the bank's own deposit accounts and treasury, tax, and loan accounts (companies' payroll taxes deposit accounts). E & W used the same basic method of valuing core deposits intangible for each of the acquired banks. a. Overview
Petitioner first determined the average balance of each deposit account. The reserve requirement, i.e., the percentage of funds required by the Federal Reserve to remain on deposit and not available for investment purposes, was then subtracted from the average balance to arrive at the "Net Average Balance," the amount of the deposit account funds actually available for use. The Net Average Balance was multiplied by the Funds Revenue Rate (the estimated rate of return on investments) to determine the amount of revenue the deposit account would generate in one year. The annual interest expense was then subtracted from the annual revenue generated by NOW and savings accounts. Similarly, the annual service charge income generated by demand deposits and NOW accounts was added to the annual revenue generated by the account. Next, petitioner subtracted its estimate of the net cost of servicing *574 the particular type of account. The remainder was the annual net income generated by the account. Finally, petitioner estimated the present value of the annual net income to be generated by the core deposit account over the useful life of the account. No post-acquisition data was used in calculating the value of the acquired core deposits intangible of the Five Banks and Exchange. b. Account-by-Account Basis
Core deposits for each acquired bank were evaluated on the basis of five categories: personal demand deposits, corporate demand deposits, NOW accounts, personal savings deposits, and corporate savings deposits. Once the formula to be used was determined for each bank and category of deposit, the value of each core deposit intangible associated with each core deposit account was calculated on an account-by-account basis. Each account was then reviewed and the bank's few internal accounts were excluded. The amounts of core deposits intangible with respect to each remaining account were added to arrive at the aggregate core deposits intangible value for each type of account of each acquired bank. c. Deposit Balances
The calculations of the value of the acquired core deposits *575 intangible were made on an account-by-account basis starting with the current or average balance of individual accounts. The current balance or, when available, the average daily balance of each deposit account, was obtained from the computer tapes of each bank. [6] *576 The aggregate of the current or average balance of each type of account for each bank was as follows: Demand Deposit Accounts
Savings
Bank
Personal
Corporate
NOW
Personal
Corporate
Arvada
$ 8,573,261
$ 8,190,806 $ 2,938,999 $ 8,806,620 $ 357,245  Aurora
3,227,917
3,986,574
719,889
2,376,515
238,841
Boulder
6,256,150
13,970,950
2,057,825
5,561,382
1,322,011
Exchange
8,978,605
28,253,759
15,484,967
16,072,713
2,680,532
Ft.Collins
3,063,780
2,850,650
1,252,852
2,114,322
352,452
Park
2,116,093
1,690,309
1,216,831
2,334,454
138,239
Pueblo
7,688,941
23,321,416
6,514,019
15,700,969
1,249,270 After all computations were made, the printout from the computer tapes was reconciled with the books of each bank to ensure correctness. d. Reserve Requirement Funds
The average or current balance of each account was reduced by the percentage of funds required by the Federal Reserve Board (FRB) to remain on deposit. The FRB reserve requirements are specific to the size of the bank and the particular type of account. The FRB reserve requirement percentages used in valuing the acquired core deposits intangibles represent the average reserve requirement rates to be experienced by each bank for each type of account over the five years following the valuation date, taking into account the phase-in requirements of FRB Regulation D. The reserve requirement rates were obtained from the FRB statements available to each bank. The following Federal Reserve requirements were used for each type of core deposits account at each of the acquired banks: Demand
Savings
Deposit
Bank
Accounts
NOW
Personal
Corporate
Arvada 3.0% 3.0%
0%   3.0% Aurora 3.46%
3.0%
.46% 3.46%
Boulder 3.56%
3.0%
.056%
3.56%
Exchange 7.77%
7.6%
.13% 3.13%
Ft. Collins
3.34%
3.0%
.34% 3.34%
Park 3.44%
3.0%
.45% 3.45%
Pueblo
3.45%
3.0%
.45% 3.45%
*577 e. Funds Revenue Rate
The Funds Revenue Rate is petitioner's estimate of the average rate which can be earned on invested assets. To determine the Funds Revenue Rate, petitioner compared the current yield on total average assets (actual interest income realized divided by the average total value of earning and nonearning assets) at the acquired banks, the current and historic five-year average yields on total average assets for existing CNB banks, the current rate of return earned by the acquired banks, and the current yields on total average earning assets (tax adjusted) for each acquired bank and its competitors. Petitioner also considered the costs of making and servicing loans. Petitioner used a Funds Revenue Rate of 11 percent as the rate which each acquiring bank expected to earn on core deposits available for investment over the useful life of the acquired core deposits. Petitioner originally determined a Funds Revenue Rate of 12 percent, but lowered it 1 percent in case such items as float and other costs were underestimated. The higher the Funds Revenue Rate used, the higher the calculated core deposits intangible values. The return on average assets takes into account *578 float and similar items. Float is the amount of deposits received but not available for investment because the funds have not yet cleared through the banking system. Although market interest rates rose to post-World War II highs in mid-1982, petitioner viewed them as an aberration that was not likely to continue over an extended period. f. Interest Expense
In 1981, petitioner's NOW and savings accounts paid interest at 5.25 percent, the maximum interest allowable at that time under Regulation Q. Accordingly, an interest expense of 5.25 percent was used in valuing the core deposits intangible associated with both the NOW and savings deposits accounts of the acquired banks. g. Service Charge Income
Demand deposit and NOW accounts generate service charge income for banks. Petitioner ascertained the total amount of annual service charge income earned by each bank's core deposits from the records of the acquired banks. It compared the actual figure with the industry average of service charge income contained in the FRB Functional Cost Analysis Report (the Functional Cost Report). [7] *579 Exchange and the Five Banks participated in the Functional Cost Report survey. With respect to the demand deposit accounts of each of the acquired banks and the Arvada NOW accounts, E & W based the projected annual service charge income on each bank's actual service charge income. However, because the acquired banks were only recently able to offer NOW accounts to their depositors, little historical data was available with respect to their NOW accounts. Accordingly, E & W based the annual service charge income with respect to the NOW accounts of the Five Banks and Exchange on the Functional Cost Report. The Functional Cost Report allocated' demand deposit service charge income between personal and corporate demand deposits based on the ratio between the two types of accounts as listed in the Report. The aggregate amount allocated to each type of account was then divided by the number of demand deposit accounts of that type to arrive at the per account service charge income figure. The per account amount of each bank's service charge income was then *580 allocated to each account. The estimates for expected annual service charge income used for each type of core deposits account were as follows: Demand Deposit Accounts
Bank
Personal
Corporate
NOW
Arvada
$ 51.54
$ 81.26 $ 9.73 Aurora
68.68  134.10  16.80  Boulder
44.28  61.60   16.80  Exchange
50.23  50.42   *      Ft. Collins
56.59  113.11  16.80  Park
49.25  100.00  16.80  Pueblo
47.46  92.70   16.80  h. Cost of Servicing Deposits
In estimating the costs associated with maintaining core deposits at the acquired banks, petitioner totaled all of the operating expenses of each of the acquired banks, including: payroll, Federal Deposit Insurance Corporation (FDIC) insurance premiums, personnel costs, advertising, marketing and promotional expenses, amortization, utilities, and rent. In general, the operating expenses included all expenses of the bank other than interest expense and the provision for loan losses. E & W calculated the ratio *581 of deposits to the total assets and liabilities of the bank, and then applied that ratio to operating expenses to determine the cost of servicing deposits. E & W compared petitioner's cost of servicing deposits to the annual cost of servicing deposits contained in the Functional Cost Report for similar banks. The Functional Cost Report includes in the cost of servicing deposits all operating expenses of a bank other than interest expense and the provision for loan loss, e.g., personnel costs, advertising and marketing expenses, FDIC insurance premiums, and amortization of fixed assets. Because the expenses derived from the Functional Cost Report were somewhat higher than the actual costs of servicing the deposits of the Five Banks and Exchange, E & W used the higher Functional Cost Report figure to be more conservative. By using the higher expense figure, the value of the acquired core deposits intangible was decreased. For Arvada, the actual cost of servicing deposits was used because its deposit account servicing costs were reasonable when compared to the costs in the Functional Cost Report for banks of a similar size. Petitioner used the following as the annual costs of servicing *582 each type of core deposits account at each acquired bank: Demand Deposit Accounts
Savings
Bank
Personal
Corporate
NOW
Personal
Corporate
Arvada
$ 78.00
$ 178.00
$ 78.00
$ 39.00
$ 39.00
Aurora
78.48  264.24  83.16  27.69  27.69  Boulder
78.48  64.24   83.16  27.69  27.69  Exchange
80.64  196.32  * 71.64
30.22  30.22  Ft.Collins
78.48  264.24  83.16  27.69  27.69  Park
78.48  264.24  83.16  27.69  27.69  Pueblo
78.48  264.24  83.16  27.69  27.69   i. Lifing Studies
E & W conducted a lifing study to determine the predicted decline, i.e., "runoff," of checking and savings accounts at Exchange, Arvada, Boulder and Ft. Collins. The data from the Boulder and Ft. Collins lifing studies and a similar lifing study performed with respect to the core deposit accounts at CNB-Denver, a CNB subsidiary, was used to estimate the useful lives of the Aurora, Park, and Pueblo core deposit accounts. Petitioner gathered data on account terminations at the acquired banks *583 and comparable banks during the period immediately before acquisition. Using this data, petitioner established a runoff pattern for acquired accounts, and estimated the useful lives of the core deposits intangible. In calculating the runoff pattern, petitioner stratified the accounts by bank, type of account (i.e., demand, savings, and NOW accounts), and year in which the account was opened. E & W stratified the accounts by personal demand, corporate demand, personal savings, corporate savings, and NOW accounts for the Arvada and Exchange lifing studies. This is similar to the method utilized by the taxpayer in Citizens & Southern Corp. v. Commissioner, 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). At the time of the acquisitions, NOW accounts were relatively new instruments and historical experience relative to useful life was not available. Because of the hybrid nature of NOW accounts, petitioner estimated their useful lives based on historical data available with respect to checking and savings accounts. In determining the useful life of the acquired core deposits, E & W first selected two points in time approximately one year apart. Each *584 bank's computer tapes for those dates were obtained, and core deposits were separated into demand and savings accounts. E & W stratified the core deposit accounts by type of account and year in which opened. By calculating the number of accounts which closed over a specified period of time, E & W determined "termination" or "lapse" rates and the corresponding weighted average remaining lives of core deposit accounts for each stratified year and account type. E & W did not consider account balances in determining lapse rates. E & W then calculated the percent of accounts that closed in each category and for each year to obtain a lapsing curve. The lapsing curve showed the probability that an account opened in a certain year would be likely to close in a coming year. E & W next applied the lapsing curve to the accounts to determine how long a group of accounts, by opening-date stratum, would remain open. E & W then lengthened the useful life over which core deposits intangible were to be amortized by approximately two to three years in order to give effect to the actual withdrawal pattern. E & W next projected the future annual decline of the balances of the acquired core deposit *585 accounts. The runoff of acquired core deposits tracks with reasonable closeness the runoff of cash flow from, and the decline in value of, the core deposits intangible. During each year of the amortization period, each core deposit intangible was amortized by an amount proportionate to the projected decline of the acquired core deposits balance. Thus, the amortization schedule followed the amount of acquired core deposits that was projected to lapse during the time period. E & W's lifing studies of core deposit accounts focused on the percentages of accounts remaining rather than the percentages of account dollars remaining at the end of the study periods because it assumed that large balance and small balance accounts lapsed at the same rate. j. Weighted Average Remaining Lives
Once determined, lapse rates were coupled with actuarial mortality tables to determine the average remaining lives (unweighted). These were then weighted by the aggregate account dollars in each stratified year to determine the weighted average remaining lives of the demand deposit and savings accounts at Arvada, Boulder, Ft. Collins, and Exchange Bank. E & W determined the useful life of the particular *586 type of acquired deposits based on the weighted average of dollar balances within each stratum. The "weighted average" was calculated by multiplying the total dollar balance of the accounts within an opening-date stratum by the projected useful life of the particular stratum and then by dividing that product by the aggregate dollar balance of all accounts in that strata. E & W's calculations of weighted average remaining lives considered all acquired core deposit accounts, including those expected to remain longer than the periods of amortization determined by petitioner. E & W conducted lifing studies of actual accounts at Arvada, Boulder, Ft. Collins, and Exchange to determine the weighted average remaining lives of their demand deposit and savings accounts, but was unable to obtain historic data with respect to Park, Pueblo, and Aurora. Instead, E & W compared the size and type of each of these banks, together with the attributes of the community each bank served, to Ft. Collins and Boulder, the banks for which petitioner had actual data. In addition, these banks and their markets were compared to CNB-Denver. Useful lives in between those for the Ft. Collins and Boulder accounts *587 were used for Aurora and Park. However, because Pueblo was an older, downtown bank that was located in a less dynamic community, a longer useful life of five years was used. E & W examined all open core deposit accounts being acquired at Aurora, Boulder, Ft. Collins, Park, and Pueblo to determine their weighted average ages. Weighted average age shows how long (on the average) accounts have been open at the banks as of a given date. In addition, E & W sampled closed core deposit accounts at Boulder, Ft. Collins, Park, and Pueblo to determine the average age of such accounts at closing. E & W did not conduct any actuarial lifing studies of NOW accounts at any of the acquired banks. Instead, the weighted average remaining lives of NOW accounts at Arvada and Exchange were estimated to be the same as the computed weighted average remaining lives of their personal demand deposit accounts. E & W estimated the weighted average remaining lives of NOW accounts at Boulder, Ft. Collins, Aurora, Park, and Pueblo to be the same as the calculated weighted average remaining lives of their personal and corporate (combined) demand deposit accounts. E & W assumed that banks serving similar communities *588 and having similar attributes would have core deposit accounts with similar weighted average remaining lives. Petitioner attributed the short weighted average remaining lives of core deposit accounts at Boulder and Ft. Collins, ranging from 3.2 to 5 years, to each bank's proximity to a university with a large student population. E & W estimated the weighted average remaining lives of core deposit accounts at Aurora, Park, and Pueblo to be similar to those observed at Boulder and Ft. Collins. E & W assumed that the aggregate net average balance of a particular type of core deposit account would remain unchanged until the end of the determined weighted average remaining life, at which time the aggregate net average balance of the accounts would drop to zero. The actual income stream from core deposit accounts was expected to decline steadily and in proportion to the declining aggregate core deposit account balances. E & W's method of valuation assumed that some income expected to be earned from core deposit accounts in later years would be earned in an earlier period, the period determined to be the weighted average remaining life of the accounts. The present value of each dollar of *589 income earned in later years is less than the present value of each dollar of income earned in earlier years. The pattern of aggregate account balance runoff assumed by E & W for the purpose of valuing core deposits intangible resembles the following: [SEE FIGURE IN ORIGINAL] The actual pattern of aggregate core deposit account balance runoff expected by E & W at the seven banks resembles the following: [SEE FIGURE IN ORIGINAL] The following chart shows the estimated useful lives (in years) used by E & W for the acquired core deposit accounts: Demand Deposit Accounts
Savings
Bank
Personal
Corporate
NOW
Personal
Corporate
Arvada
10.00 8.10  10.00 6.00
6.00
Aurora
4.00  4.00  4.00  4.00
4.00
Boulder
* 5.41
* 5.41
* 5.41
4.00
4.00
Exchange
4.12  8.55  4.12  3.67
3.67
Ft. Collins
3.21  3.21  3.21  4.34
4.34
Park
4.00  4.00  4.00  4.00
4.00
Pueblo
5.00  5.00  5.00  5.00
5.00
Based on his review of the E & W methodology, Dr. George E. Bardwell, professor of mathematics and statistics at the University of Denver, concluded that E & W's statistical methodology yields results *590 which were reasonable and quite close to those that would be obtained from a more complex exponential approximation of the useful life of the acquired core deposits. Petitioner does not regularly audit its core deposit accounts at any of the acquired banks to monitor their actual lives. k. Discount Rate
Petitioner determined a rate for discounting the projected earnings of the core deposits of each acquired bank. The discount rate used was petitioner's estimate of the projected return on equity for the particular bank. In determining a rate of return on equity assumption for each acquired bank, petitioner considered the following factors: the earnings multiple of the acquired bank, the current and five-year average returns on average equity at the target banks, the current and five-year average returns on average equity for other CNB banks, the current and five-year weighted average returns on equity for the target banks' competitors, and the earnings-to-price ratios for bank stocks in general and for the target bank. Petitioner selected the following after-tax discount rates for valuing core deposits intangible at the acquired banks: Acquired Bank
Discount Factor
Arvada  15%
Aurora  14%
Boulder  16%
Exchange  17%
Ft. Collins  15%
Park  15%
Pueblo  16% The *591 lower the discount rate used, the higher the value of the acquired core deposits intangible. Conversely, the higher the discount rate used, the lower the value of the acquired core deposits intangible. Respondent's expert witness, Professor Kane, stated that the rate of return on equity method used by petitioner to determine the discount rates was generally a "conservative procedure" and somewhat on the "low side" of rates employed by investment bankers during 1981 and 1982. 6. Amortization of Core Deposits Intangible under Generally Accepted Accounting Principles
Petitioner allocated the purchase prices of its acquired banks in accordance with generally accepted accounting principles. For example, under generally accepted accounting principles, an acquired core deposits intangible is required to be recorded at its fair market value at the time of a bank acquisition and amortized over its expected life.
7. Banking Deregulation
Interest rates were exceptionally high in the early 1980's. Market interest rates went far above Federal ceilings on deposit interest rates between 1974 and 1982. During this time, many bank depositors withdrew deposits to take advantage of higher interest *592 rates offered by nonbanking financial institutions. Interest ceilings on savings and certificate accounts were phased out between 1980 and 1986 pursuant to the Depository Institutions Deregulation Act of 1980, 12 U.S.C.A. sec. 3501, et seq. Deregulation was intended to provide greater parity between banking and nonbanking institutions. It permitted commercial banks to offer new types of deposit accounts. Between December 31, 1980, and January 6, 1983, banks introduced interest-bearing checking accounts called NOW and Super NOW accounts and Money Market Deposit Accounts (also known as Growth Reserve Accounts). These were not subject to interest rate limitations. At the time of the acquisitions, petitioner believed deregulation would have a significant effect on the banking industry. Petitioner expected interest costs to rise as a result of deregulation, and demand deposit and savings accounts to close in favor of higher-interest NOW, Super NOW, and Money Market Deposit Accounts. However, petitioner made no adjustment in calculating savings account core deposits intangible at the acquired banks for the higher interest rates expected as a result of deregulation because petitioner *593 assumed that few savings accounts would remain by the time interest rate ceilings were lifted. 8. Present Value Factor
E & W determined the present value of the core deposits intangible by multiplying the net income generated by each account in the first year by a discount factor representing a stream of annual payments over the estimated useful life of the account. The discount factor was derived from a present value table, and was determined by applying an annual discount rate over the average number of years the acquired core deposit accounts were projected to remain at the bank. 9. Application of After-Tax Method
Petitioner valued core deposits intangible on a pretax basis, but used after-tax discount rates to present-value these before-tax income streams. The after-tax valuation methodology takes into account two elements: (1) the future after-tax income stream associated with core deposits, and (2) the tax benefit of the future tax deductions associated with core deposits intangible. John Fox, an accountant and tax manager of petitioner, recalculated the values of petitioner's acquired core deposits intangible on an after-tax basis using an effective tax rate of 20 percent. *594 Dale Winter concluded that if the valuation were made on an after-tax basis, it would be appropriate to use the bank's effective tax rate, which in 1981 was approximately 15 to 20 percent. Below is a summary of the values of the acquired core deposits intangible on an after-tax basis: Revised Value of Core
Bank
Deposits Intangible
Aurora
$ 2,056,490.29    Boulder
5,784,797.87   Ft. Collins
1,107,049.96   Park
954,301.33   Pueblo
* 11,421,718.54   Exchange
14,809,458.07   Arvada
2,600,934.00   TOTAL          $ 38,734,750.06   10. Application of the Cost Savings Method
The market alternative rate is the rate one must pay to obtain the next cheapest source of funds. Certificates of deposit were the next cheapest source of funds available to petitioner at the time of the bank acquisitions. On the dates of the Five Banks, Exchange, and Arvada acquisitions, the certificates of deposit interest rates were 13.83, 9.64, and 9.54 *595 percent, respectively. Dale Winter considered various factors and concluded that the appropriate market alternative rates for the Five Banks, Exchange, and Arvada were 13.0, 10.0, and 9.0 percent, respectively. The market alternative rates determined by Winter do not include the costs of obtaining the certificates of deposit or other alternative sources of funds. As indicated by Professor Kane, the cost of servicing loans is not taken into account if core deposits intangible is valued by the cost savings method. Under the valuation method employed by E & W, float was accounted for by use of a conservative Funds Revenue Rate. That is, petitioner reduced the Funds Revenue Rate it determined (12 percent) to 11 percent to account for float and other miscellaneous costs. However, if the cost savings method is used and the market alternative rate is used in lieu of the Funds Revenue Rate, float must be separately accounted for in calculating the value of the core deposits intangible associated with the checking accounts. At the time of the acquisitions, the float rate was 3.32 percent for banks with less than $ 50 million of deposits and 7.06 percent for banks with deposits of $ 50 million *596 or more. See Federal Reserve Banks, 1982 Functional Cost Analysis at 7. A summary of the values of CNB's acquired core deposits intangible using a cost savings method of valuation follows: Revised Value of Core
Bank
Deposits Intangible
Aurora
$ 2,313,716.00     Boulder
6,453,726.00    Ft. Collins
1,356,453.00    Park
1,056,317.00    Pueblo
11,996,278.00    Exchange
13,108,971.32    Arvada
2,600,934.00    TOTAL      $ 38,886,395.32     A summary of the values of the acquired core deposits intangible on an after-tax basis using the cost savings method appears below: Revised Value of Core
Bank
Deposits Intangible
Aurora
$ 2,313,716.00     Boulder
6,453,726.00    Ft. Collins
1,356,453.00    Park
1,056,317.00    Pueblo
11,996,278.00    Exchange
11,890,412.91    Arvada
2,600,934.00    TOTAL      $ 37,667,836.91    11. Should FDIC Insurance Be Considered?
Banks pay premiums for FDIC insurance. Thus, E & W included FDIC insurance premiums in the costs associated with maintaining core deposit accounts. As indicated by Professor Kane, FDIC insurance is not relevant if a cost savings valuation method is used. OPINION Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, *597 wear and tear, and obsolescence of property used in the trade or business. The term "property" includes both tangible and intangible property. Sec. 1.167(a)-3, Income Tax Regs., sets forth rules for the depreciation of intangibles as follows: Sec. 1.167(a)-3 Intangibles. if an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * * To qualify for depreciation of core deposits intangible, petitioner must establish that its core deposits intangible (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable *598 accuracy. Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1250 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990); Banc One Corp. v. Commissioner, 84 T.C. 476, 492 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987); L.A. Central Animal Hosp. v. Commissioner, 68 T.C. 269, 273 (1977).Whether these requirements have been met is essentially a factual question. Citizens & Southern Corp. v. Commissioner, supra; Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 232 (1975). We will first decide whether petitioner established that its core deposits intangible have an ascertainable value separate and distinct from goodwill. Next, we will decide whether petitioner's core deposits intangible have a limited useful life, the duration of which can be determined with reasonable accuracy. Finally, we will decide whether the values and amortization schedules used by petitioner with respect to the acquired core deposits intangible were reasonable. 1. Petitioner has Shown that the Core Deposits Intangible Have an Ascertainable *599 Value Separate and Distinct from Goodwill
The nature of goodwill is the expectancy that "the old customers will resort to the old place." Karan v. Commissioner, 319 F.2d 303, 306 (7th Cir. 1963), affg. Estate of Melnik v. Commissioner, T.C. Memo. 1961-18 and T.C. Memo. 1962-129; Commissioner v. Killian, 314 F.2d 852, 855 (5th Cir. 1963), affg. T.C. Memo. 1961-83; Nelson Weaver Realty Co. v. Commissioner, 307 F.2d 897, 901 (5th Cir. 1962), affg. in part and revg. and remanding in part 35 T.C. 937 (1961).Goodwill is the "expectancy of continued patronage, for whatever reason." Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961).It is a "preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely." Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 233 (1975), citing Skilken v. Commissioner, 420 F.2d 266, 268 (6th Cir. 1969), affg. 50 T.C. 902 (1968).Factors which contribute to goodwill include: a favorable reputation, skilled personnel, a convenient location, inertia factors, or other "accidental circumstances * * * or prejudices." Metropolitan Bank v. St. Louis Dispatch Co., 149 U.S. 436, 446 (1893). *600 Goodwill of an ongoing business is nonamortizable as a matter of law. Section 1.167(a)-3, Income Tax Regs.; Donrey, Inc. v. United States, 809 F.2d 534, 536 (8th Cir. 1987); Skilken v. Commissioner, supra at 269; Boe v. Commissioner, supra at 343. Going-concern value is an intangible, nonamortizable capital asset that is often considered part of goodwill. UFE, Inc. v. Commissioner, 92 T.C. 1314, 1323 (1989).However, while the distinctions between goodwill and going-concern value have sometimes been blurred, they are different conceptually. See United States v. Cornish, 348 F.2d 175, 184 (9th Cir. 1965); UFE, Inc. v. Commissioner, supra at 1323; Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 234-235 (1975); Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 685 (5th Cir. 1971).Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern," VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner, 17 T.C. 506, 514 (1951); and is manifested in the business' ability to operate without interruption and to continue generating *601 sales after an acquisition. Computing & Software Inc. v. Commissioner, supra at 235. Our inquiry is primarily factual. "We must decide whether the record provides sufficient evidence to permit a reasonable allocation to an amortizable intangible asset. Manhattan Co. of Virginia, Inc. v. Commissioner, 50 T.C. 78, 92-93 (1968). Petitioner argues that its ability to earn income for a limited, measurable period of time, by investing account funds on deposit at the date of a bank's acquisition, is an asset separate and distinct from goodwill. It relies principally on Citizens & Southern Corp. v. Commissioner, supra, in which we found that the taxpayer had established that core deposits intangible had an ascertainable cost basis, separate and distinct from goodwill, and a limited useful life, the duration of which the taxpayer had ascertained with reasonable accuracy. As did the Court in Citizens & Southern, supra, petitioner also relies on First Pennsylvania Banking & Trust Co. v. Commissioner, 56 T.C. 677 (1971), to support the proposition that core deposits intangible is separate and distinct from goodwill. In First Pennsylvania Banking & Trust Co., the taxpayer acquired a loan servicing *602 business as a going concern. Notwithstanding the fact that the loan servicing agreements were terminable at will, the Court found that they had a determinable life, and amortization was proper. The rights to service existing loans of various lending institutions and the opportunity to utilize escrow funds associated therewith were valued separately from the other intangibles acquired and amortized over their remaining useful lives. Petitioner maintains that a core deposits intangible is separate and distinct from goodwill in that core deposits have an ascertainable value based on the income produced or costs saved by holding deposits, for which low or no interest is paid, and lending those funds at a higher rate of interest over the limited life of the deposits. Reasonable predictions of costs saved and revenues to be derived from core deposits can be made over their expected lifetime. Petitioner contends that under generally accepted accounting principles, core deposits are recognized as being separate and distinct from goodwill. Accounting Principles Board (APB) Opinion No. 17, "Intangible Assets" (August 1970), requires that intangible assets acquired in connection with the acquisition *603 of an enterprise be recorded at their fair market values, but the costs of acquiring identifiable intangible assets are not included in goodwill. APB Opinion No. 17 also requires that acquired intangible assets be amortized on a schedule based on their estimated lives. [8]Financial Accounting Standards Board (FASB) Interpretation No. 9, "Applying APB Opinions No. 16 and 17 When a Savings and Loan Association or Similar Institution is Acquired in a Business Combination Accounted for by the Purchase Method" (February 1976), specifically lists the capacity of existing savings accounts to generate future income as an identifiable intangible asset, and provides that the amount paid for this future income-generating asset is not included in goodwill. FASB Statement No. 72, "Accounting for Certain Acquisitions of Banking or Thrift Institutions," (February 1983), requires that a separately identifiable asset be assigned a portion of the total cost of the acquired enterprise if the fair value of the asset can be reliably determined in a bank acquisition accounted for by the purchase method.
Similarly, petitioner contends that *604 the regulatory authorities recognize core deposits as being separate and distinct from goodwill. In December 1981, the OCC issued Banking Circular 164 which allowed banks to record core deposits intangible as an identified intangible asset and amortize it over the life of the acquired deposit accounts, but not more than 10 years. This was an interim policy, effective January 1, 1981. In July 1985, the OCC issued Revised Banking Circular 164, making the amortization of core deposits intangible mandatory. Petitioner also points to the recognition by the Securities and Exchange Commission in SEC Staff Accounting Bulletin No. 42, "Application of Existing Accounting Standards to Business Combinations Accounted for by the Purchase Method Involving Financial Institutions" (December 23, 1981), that any identifiable, intangible asset associated with the deposits of an acquired institution is an amortizable asset separate and distinct from goodwill and should be recorded at its estimated fair market value as of the acquisition date and amortized on an accelerated basis over a period which reflects the pattern of the expected runoff of the related deposits. The separate and distinct asset being *605 purchased is described in FASB Statement No. 72 as the value relating to depositor or borrower relationships existing at the date of acquisition without regard to new depositors or borrowers that may replace them. Respondent contends that the value of core deposits intangible is goodwill (or a portion thereof). Respondent argues that what petitioner terms core deposits intangible is merely petitioner's inaccurate measurement of a portion of the goodwill value associated with the acquired banks' preexisting deposit customer relationships. Citing AmSouth Bancorporation and Subsidiaries v. United States, 681 F. Supp. 698, 720 (N.D. Ala. 1988), respondent argues that even if it is shown that a core deposits intangible has "ascertainable value" and a "limited useful life," it must also be shown that such value is "separate and distinct" from the value of goodwill. Thus, even if we find that petitioner has established a "life" and a "value" for core deposits intangible, we must still inquire into the intrinsic nature of the asset measured and determine whether it is, in essence, goodwill. In AmSouth Bancorporation and Subsidiaries v. United States , supra, the court concluded that the *606 taxpayer did not meet its burden of proving that the acquired customer deposit base had a value separate and distinct from the goodwill of the acquired bank. The court based its conclusion on the tendency of the deposit relationship to become inseparable from goodwill since the deposit relationship is a "point of contact" with customers for selling the bank's income-producing services. AmSouth Bancorporation and Subsidiaries v. United States, supra at 719-720.The court also concluded that the value of acquired deposit base results from the expectation that depositors will leave their funds on deposit and earnings will result therefrom. AmSouth Bancorporation and Subsidiaries v. United States, supra at 720. Our examination of the entire record, including the testimony and reports of the expert witnesses, compels a result different from the court's finding in AmSouth Bancorporation. Citizens & Southern Corp. v. Commissioner, supra at 481. The evidence establishes that one of petitioner's goals in acquiring the target banks was to acquire a level and mix of core deposits that would enable it to meet the loan demand that existed in Colorado at the time of the acquisitions and that *607 petitioner paid a premium for the core deposits. In Banc One Corp. v. Commissioner, supra at 490, we recognized that the economic value of core deposits depends on their ability to generate a stream of earnings over time. We also noted that the assumption of the deposit liabilities, rather than the purchase of the assets, often represents the economic purpose behind the acquisition of a bank. Core deposits are a low-cost source of funds and are an important factor contributing to the profitability of a commercial bank. Moreover, the economic value attributable to the opportunity to invest the core deposits can be valued with a fair degree of accuracy based on the core deposits acquired in the purchase. Petitioner ascertained that the deposit accounts closed at predictable rates and quantified the benefit arising from the use of the funds versus the cost of alternate sources of funds. It is this benefit which petitioner set up as an asset and depreciated. The fact that new accounts may be opened as old accounts are closed does not make the deposit base self-regenerative. See Computing & Software, Inc. v. Comissioner, supra at 236. Furthermore, the value of the deposit base does *608 not depend upon a vague hope that customers will patronize the bank for some unspecified length of time in the future. The value of the deposit base rests upon the ascertainable probability that inertia will cause depositors to leave their funds on deposit for predictable periods of time. Citizens & Southern Corp. v. Commissioner, supra at 499-500. Goodwill, by definition, has an indefinite life and is valued using the residual method. By contrast, the deposit accounts of the acquired banks could be, and were, identified; had limited lives that could be estimated with reasonable accuracy (see discussion below); and could be, and have been, valued directly with a fair degree of accuracy. Moreover, petitioner's deposit accounts were not self-regenerating. See Citizens & Southern Corp. v. Commissioner, supra at 499.Therefore, the deposit accounts were assets with values separate and apart from goodwill. It is these characteristics which separate them from general goodwill and permits separate valuation. See Newark Morning Ledger Co. v. United States, 734 F. Supp. 176 (D. N.J. 1990).We conclude that petitioner has proven that the core deposits intangible at issue here has an ascertainable *609 cost basis separate and distinct from the goodwill and going-concern value of the acquired banks. Although a core deposits intangible is closely interrelated to goodwill, it is nevertheless a separate and distinct asset. 2. Petitioner has Proven that the Core Deposits Intangible Has a Limited Useful Life
The useful life of property is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business. Sec. 1.167(a)-1(b), Income Tax Regs.
A taxpayer may establish the useful life of an asset for depreciation based on his own experience with similar property or, if his own experience is inadequate, based on the general experience of the industry. Sec. 1.167(a)-1(b), Income Tax Regs. The taxpayer need only determine a "reasonable approximation" for depreciation; absolute certainty is not required. Burnet v. Niagara Brewing Co., 282 U.S. 648, 654-655 (1931); Super Food Services, Inc. v. United States, 416 F.2d 1236, 1238 (7th Cir. 1969); Spartanburg Terminal Co. v. Commissioner, 66 T.C. 916, 929 (1976)."Extreme exactitude in ascertaining the duration of an asset is a paradigm that the law does not demand." Houston Chronicle Publishing Co. v. United States, supra at 1253-1254. *610 The useful life of an asset must be based upon facts existing as of the close of the taxable year in issue. Southern Bancorporation, Inc. v. Commissioner, 847 F.2d 131, 137 (4th Cir. 1988), affg. T.C. Memo. 1986-601; Banc One Corp. v. Commissioner, supra at 499.Evidence of a taxpayer's subsequent experience, however, is acceptable to corroborate its projections based on prior experience. Super Foods Services, Inc. v. Commissioner, supra at 1240; Banc One Corp. v. Commissioner, supra at 501.Compare Southern Bancorporation, Inc. v. Commissioner, supra(taxpayer used hindsight evidence as sole means to determine useful life of its acquired deposit base). The most significant indication that an intangible asset is separate and distinct from goodwill is that its useful life can be shown with reasonable accuracy to be of limited duration. Richard S. Miller & Sons, Inc. v. United States, 537 F.2d 446, 452 (Ct. Cl. 1976).Moreover, where the useful life of an intangible is shown to be limited, depreciation is available even though for some purposes it is an element of goodwill. Richard S. Miller & Sons, Inc. v. United States, supra at 450. Petitioner engaged E & W to conduct a lifing *611 analysis and to estimate the useful lives of the core deposit accounts. Petitioner argues that its core deposits intangible has a limited useful life because industry and petitioner's pre-acquisition experience indicate that deposit accounts close at predictable rates. Thus, petitioner's core deposits intangible was valued and purchased not on the assumption of permanent utility but with the realization of its limited usefulness. Petitioner contends that it correctly estimated the useful life of its core deposits intangible by establishing a runoff pattern for its acquired accounts. Petitioner further maintains that its lifing studies were conducted in a manner similar to the lifing studies in Citizens & Southern, in which we concluded that the acquired core deposits intangible had a limited useful life determinable with reasonable accuracy. The evidence establishes that deposit accounts do not remain indefinitely with a bank but close for a variety of reasons. Although it is not possible to predict when a particular deposit account will close, it is possible to estimate the percentage of accounts that will close over a given period of time. * * *
91 T.C. at 505. Finally, petitioner *612 argues that its follow-up study of the actual closures of acquired accounts verifies the validity of its projections. Respondent maintains that petitioner failed to determine the useful life of its core deposits intangible with reasonable accuracy because its underlying lifing studies were defective. Respondent claims that petitioner's lifing studies were inaccurate for the following reasons: (1) No actual lifing studies were performed of core deposit accounts at Aurora, Park, and Pueblo Banks. (2) No lifing studies for NOW accounts were conducted at any of the acquired banks. (3) All of petitioner's studies focused on the expected lives of core deposit accounts rather than the lives of core deposit account dollars. (4) Petitioner failed to consider the foreseeable effects of deregulation in the banking industry on the useful lives of the core deposit accounts. Respondent further contends that the useful lives (i.e., amortization periods) selected by petitioner were shorter than the periods over which it expected the core deposits intangible to be useful. Core deposits are useful as long as the deposits are available to produce income (or cost savings). Respondent argues that *613 petitioner's averaging convention "pushed up" the income expected from deposits remaining beyond the determined weighted average remaining life into the amortization period. That is, petitioner, included income from all accounts expected to remain after the truncated amortization period in the income stream expected from the deposits during the weighted average remaining life but made no corresponding adjustment for valuation purposes. Claiming that the acquired core deposits were expected to be useful (i.e., produce income) for at least 20 years, respondent concludes that petitioner did not spread the cost of acquired core deposits intangible over the years in which it contributed to the production of income. Respondent thus asserts that had petitioner determined useful lives in a manner more reasonably related to the income-producing lives of the core deposits, the annual amortization percentages would have been significantly lower. As discussed below, we find that petitioner used an appropriate averaging convention. While the essence of goodwill is the expectation of continued business for an indefinite time, the essence of core deposits intangible is the expectation that it *614 will decline over a predictable period of time. Banc One Corp. v. Commissioner, 84 T.C. at 490. Petitioner conducted lifing studies at Exchange, Arvada, Boulder, and Ft. Collins Banks to estimate the useful life of the acquired core deposit accounts. Petitioner based its studies upon actual experience with regard to all accounts (not a sample) of the four acquired banks. Respondent criticizes petitioner's use of industry data, rather than actual lifing studies, to compute the useful lives of Park, Pueblo, and Aurora. However, a taxpayer may establish the useful life of an asset for depreciation purposes based on his own experience with similar property or, if his experience is inadequate, based on industry experience in general. Sec. 1.167(a)-1(b), Income Tax Regs. Petitioner's use of industry data with respect to Park, Pueblo, and Aurora was a proper method of determining the useful lives of core deposit accounts at those banks. Respondent objects to petitioner's failure to conduct lifing studies of NOW accounts at any of the acquired banks. However, NOW accounts were relatively new and little data on useful life was available at the time of the acquisitions. Because of the *615 hybrid nature of NOW accounts, E & W estimated the useful life of NOW accounts based on historical experience available with respect to checking and savings accounts. Lack of actual experience does not preclude the estimation of useful life based on general experience. Sec. 1.167(a)-1(b), Income Tax Regs. Petitioner properly substituted industry experience for comparable assets to estimate the useful lives of the NOW accounts at the acquired banks. Respondent also questions whether income from core deposit accounts extending beyond the useful life calculated was included in the income stream expected during the amortization period. Petitioner notes that the average useful life is not the maximum length of time an account will stay open but rather the average time an account will stay open. Accounts close at varying times, so some accounts will close before the average useful life, and others will close beyond the average useful life. Accordingly, the projected income stream was appropriately amortized over the average useful lives of the acquired core deposit accounts. Respondent asserts that petitioner's studies improperly focused on the expected lives of core deposit accounts *616 rather than on the lives of core deposit account dollars. However, petitioner's expert, Dale Winter, determined that because large accounts close at the same rate as small accounts, it was not necessary to stratify accounts by dollar balances. In addition, Winter conducted a study which demonstrated that the decline in core deposit dollars fairly reflects the decline in core deposit accounts. Thus, petitioner's studies reasonably focused on the decline in number of accounts and stratified them by year of projected closing. Finally, respondent contends that petitioner failed to consider the effects of deregulation in the banking industry on the useful lives of the core deposit accounts. Respondent claims that it was foreseeable that deregulation would result in an increase in closures of demand deposit and savings accounts in favor of higher-interest NOW, Super NOW, and Money Market Deposit accounts, or that bank customers would shift funds to the newer higher-interest accounts. Despite respondent's prediction, the evidence shows that from 1983 to 1985 the shift from checking accounts to NOW accounts was insignificant. Similarly, petitioner's follow-up study also confirms that *617 its projections of account lives were reasonably accurate. The following chart summarizes the estimated useful lives (in years) used by E & W for the core deposits accounts acquired by petitioner: Demand Deposit Accounts
Savings
Bank
Personal Corporate
NOW
Personal
Corporate
Arvada
10.00
8.10
10.00
6.00
6.00
Aurora
4.00
4.00
4.00
4.00
4.00
Boulder
* 5.41
* 5.41
* 5.41
4.00
4.00
Exchange
4.12
8.55
4.12
3.67
3.67
Ft.Collins
3.21
3.21
3.21
4.34
4.34
Park
4.00
4.00
4.00
4.00
4.00
Pueblo
5.00
5.00
5.00
5.00
5.00
Petitioner conducted a follow-up study of the actual closures of acquired accounts comparing the percentage of the number of accounts remaining after three years to the percentage of core deposits intangible projected to be remaining. The actual percentage of accounts remaining varied only slightly from the projected remaining value of the core deposits intangible. Consolidated Results - Five Banks, Exchange, and Arvada
Percent of Core
Year from
Percent of Accounts
Deposits Intangible Amount
Acquisition
Actually Remaining
Remaining Per Projections
0
100.00%
100.00%
1
73.19%
76.32%
2
57.57%
58.62%
3
46.92%
44.66%
Evidence *618 of subsequent experience may be used to corroborate projections. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 500. Petitioner's follow-up study of the actual closures of acquired accounts verifies the validity of its projections. Thus, we hold that petitioner has shown that it calculated the useful lives with reasonable accuracy. Having concluded that the useful lives estimated by petitioner were reasonable, we need not second-guess the parties by conducting our own determination of the core deposits intangible's precise useful lives. Hunt v. Commissioner, T.C. Memo. 1990-248. The evidence establishes that deposit accounts do not remain indefinitely with a bank but close for a variety of reasons. Although it is not possible to predict when a particular deposit account will close, it is possible to estimate the percentage of accounts that will close over a given period of time. We conclude, therefore, that deposit base has a limited useful life, the duration of which petitioner ascertained with reasonable accuracy. 3. Petitioner Valued Core Deposits Using the Net-Income Stream Method
The basis for depreciation deductions is cost, not value. Secs. 167(g), 1011, and 1012. *619 Cost is what petitioner paid for the asset. Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d at 683-684.Petitioner bears the burden of proving its depreciable basis in the asset sought to be depreciated. Welch v. Helvering, 290 U.S. 111 (1933); Leahy v. Commissioner, 87 T.C. 56, 72 (1986); Credit Bureau of Erie, Inc. v. Commissioner, 54 T.C. 726, 730 (1970); Rule 142(a). Respondent contends that petitioner's net-income stream method of valuing core deposits intangible was incorrect in that it vastly overstated the value of core deposits by incorporating the value of Federal credit enhancements, i.e., the value attributable to commercial banks' ability to accept deposits as a Federally insured borrower, and of future investment income which could be earned by the acquiring bank (even in the absence of core deposits) by investment of independently acquired (e.g., market alternative) funds. Respondent maintains that the capitalized value of earnings which could be derived from lending "non-core" funds is not associated with core deposits intangible and should not be considered part of its cost basis. Moreover, inclusion of the capitalized "non-core" earnings stream in the cost *620 basis of core deposits intangible would result in double counting of an asset for which petitioner paid only once. Specifically, the capitalized value of the "non-core" earnings stream is reflected in the value petitioner assigned to its loan and securities portfolios. Thus, respondent argues that petitioner's inclusion of it again in its valuation of core deposits is impermissible. Respondent reasons that Federal deposit insurance permits petitioner to attract deposit funds at a lower cost than it would incur to obtain uninsured funds and, therefore, deposit insurance increases the spread between petitioner's cost of funds and its income from assets acquired with those funds. Thus, part of petitioner's net-income stream is attributable to the Federal deposit insurance advantage of the acquired banks rather than core deposits. Moreover, because the life of the Federal deposit insurance guarantee is indefinite in that it will exist as long as the business of the bank continues, and because petitioner would not have paid a premium for Federal credit enhancements since all banks have such coverage, respondent argues that petitioner should not be allowed to depreciate the value attributable *621 to it. Petitioner argues that the cost of FDIC insurance is included as an operating cost in determining the value of the acquired core deposits, and thus any value attributable to deposit insurance is not incorporated into the depreciable basis of core deposits. In Citizens & Southern Corp. v. Commissioner, supra at 494, this Court indicated that FDIC deposit insurance offers no premium value to a purchaser of banks because all banks have deposit insurance. See VGS Corp. v. Commissioner , 68 T.C. 563, 590-591 (1977) (foreign oil import quota created no goodwill capable of being transferred as it gave no competitive advantage). Here, petitioner properly included the cost of deposit insurance as an operating cost in calculating the value of acquired core deposits. Respondent criticizes petitioner's use of a pretax valuation method for failing to consider all expenses affecting the amount of net income or cost savings to be derived from the core deposits. In addition, respondent contends that petitioner's pretax valuation method greatly overstates the value of core deposits. Finally, respondent asserts that the 20 percent effective tax rate assumed by petitioner in making its computations *622 is incorrect and results in the overstatement of after-tax values computed. In Citizens & Southern Corp. v. Commissioner, supra, this Court upheld the use of an effective tax rate of 20 percent because that rate conformed to banking industry experience during the relevant period (1981 and 1982). Because the same years are involved in the instant case, we believe that petitioner's calculation of an after-tax value, assuming an effective tax rate of 20 percent, was correct. Respondent also contends that petitioner's selection of Funds Revenue Rate and discount rates inflated the computed values of the acquired core deposits. The Funds Revenue Rate and discount rates chosen were subjective decisions of petitioner and reflected a preference for higher deposit base valuations, thus producing exaggerated values. Respondent notes that use of a higher Funds Revenue Rate and a lower discount rate results in higher determined values for core deposits. The Funds Revenue Rate represented petitioner's estimate of the average rate which can be earned on invested assets. Rather than being conservative, respondent maintains that petitioner's selected rate was significantly higher than the then-current *623 five-year average yield on total average assets at other CNB banks, and substantially higher than the comparative data and expected economic conditions warranted. The discount rates used were petitioner's expected return on equity at each acquired bank, determined by reference to historic return on equity data for the acquired banks. Respondent claims that the discount rates used were substantially lower than the historic rates of return at the acquired banks. Respondent maintains that petitioner's use of discount rates ranging from 14 to 17 percent inflated the values of core deposits intangible and cannot be justified in view of the fact that six of the seven acquired banks had current rates of return in excess of 20 percent. Petitioner defended its use of lower discount rates on the basis that the higher rates of return were an anomaly and would not be sustained because of interest rate deregulation. Petitioner argued that, with the increase in interest costs on deposits and concomitant decrease in profits as a result of deregulation, its discount rates were reasonable and appropriate. Respondent contends that petitioner failed to establish the value of core deposits intangible *624 using the cost savings method. The value of core deposits intangible under the cost savings method is the present value of the after-tax cost savings stream associated with the banks' anticipated use of core deposits to fund its loans and other investments. The amount of the cost savings stream is the difference between the market alternative funding cost and the ongoing costs associated with maintaining core deposits. In order to establish the value of core deposits intangible under this approach, petitioner must establish the appropriate market alternative funding cost and the ongoing costs associated with maintaining the core deposits valued. Respondent claims that petitioner has failed to prove either of these two elements. Respondent further asserts that petitioner offered no evidence which would adequately reflect anticipated changes to the cost of market alternative funding over the projected lives of core deposits at any of the acquired banks. Any reasonable estimate of cost savings associated with core deposits must be made using a market alternative rate which reflects interest trends projected over the lives of such deposits. Petitioner maintains that it valued core deposits *625 intangible using a cost savings methodology which took into account changes in interest rates during the appropriate time frame. Dale Winter testified that petitioner considered various factors, including changes in interest rates, in establishing the market alternative rates for the Five Banks, Exchange, and Arvada. That portion of the purchase price paid by petitioner as a premium for the core deposits was attributable to the difference in costs between the core deposits and the market alternative. Consistent with Citizens & Southern Corp. v. Commissioner, supra at 510, we conclude that the cost savings method is the proper method for valuing core deposits. Thus, petitioner is entitled to allocate to the deposit base an amount equal to the present value of the difference in costs between the acquired core deposits and the market alternative. Petitioner used the residual method of valuation to value goodwill and going-concern value. [9] This Court has decided that this is a proper means of valuing goodwill. Under the residual method, the value of goodwill and going-concern value equals the difference between the total purchase price and the value of the other known assets. Citizens & Southern v. Commissioner, 91 T.C. at 510; *626 Banc One Corp. v. Commissioner, 84 T.C. at 502-503; Solitron Devices, Inc. v. Commissioner, 80 T.C. 1, 20-22 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); Florida Publishing Co. v. Commissioner, 64 T.C. 269, 280 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977).The primary benefit of the residual method is in obtaining a more accurate valuation of the acquired intangibles without making speculative assumptions and engaging in unnecessarily complex computations. Citizens & Southern Corp. v. Commissioner, supra at 511; Banc One Corp. v. Commissioner, supra at 506. Respondent argues that the evidence supports a greater allocation of value to goodwill and going-concern value than was made under the residual method. Under R. M. Smith, Inc. v. Commissioner, 591 F.2d 248 252-253 (3d Cir. 1979), affg. 69 T.C. 317 (1977), and Banc One Corp. v. Commissioner, supra at 502-503, *627 a determination under the residual method is not conclusive of the value of the intangible assets acquired. Whereas the purchase price is presumed to represent the fair market value of the acquired assets, either party may introduce evidence to rebut that presumption and thereby change the calculated residual value. Banc One Corp. v. Commissioner, supra at 503.Thus, respondent contends that where the evidence shows that petitioner paid more for goodwill and going-concern value than would otherwise be allocated to it under the residual method, this Court should allocate the purchase price paid between depreciable assets and nondepreciable goodwill in accordance with the evidence. Computing & Software, Inc. v. Commissioner, supra at 234-235; Seaboard Finance Co. v. Commissioner, T.C. Memo. 1964-253, affd. 367 F.2d 646 (9th Cir. 1966); Manhattan Co. of Virginia, Inc. v. Commissioner, 50 T.C. 78, 91-92 (1968). Where an allocation is warranted, respondent maintains that reduction in the cost basis assigned to other intangible assets (i.e., core deposits intangible) is proper even if it is reduced below any value the Court finds has been established for it. Seaboard Finance Co. v. Commissioner, supra. *628 This reduction gives effect to the principle that a taxpayer's basis in an asset is cost, not value. Citizens & Southern Corp. v. Commissioner, supra at 510.The reduction also comports with the regulatory requirement for apportionment of basis when a combination of depreciable and nondepreciable property is acquired for a lump sum. Sec. 1.167(a)-5, Income Tax Regs.; see Banc One Corp v. Commissioner, supra at 505 ("a taxpayer who pays a lump-sum amount for a number of assets may not attribute the cost basis of nondepreciable assets to that of depreciable assets"). Thus, respondent contends that it is improper for petitioner to allocate basis first to core deposits intangible resulting in a reduction in the basis assigned to goodwill where the evidence shows that a greater value of goodwill was actually acquired and paid for. Respondent argues that even if the Court concurs with petitioner's determination of core deposit values, an allocation of cost basis between core deposits intangible and goodwill would be necessary to reflect what petitioner paid for each. Any cost basis allocated to core deposits should not, based on this record, exceed the allocation made to goodwill. The *629 question of proper allocation is one of fact. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 511-512. The residual method is a proper method of valuing goodwill. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 510; Banc One Corp. v. Commissioner, 84 T.C. at 502-503; Solitron Devices, Inc. v. Commissioner, 80 T.C. 1, 20-22 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); Florida Publishing Co. v. Commissioner, 64 T.C. 269, 280 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977). However, in accordance with our holding that petitioner is entitled to allocate to core deposits the present value of the difference in costs between the acquired core deposits and the market alternative, petitioner must adjust its allocations of value to goodwill. The exact amount to be allocated to goodwill can be determined in the parties' Rule 155 computations. 4. Petitioner Used Reasonable Amortization Schedules to Depreciate Core Deposits
The last issue for decision is whether the amortization method used by petitioner with respect to core deposits intangible was reasonable. Section 167(a) provides for the deduction of a "reasonable allowance" for depreciation. *630 Section 167(c) indicates that the straight-line method is the only method available with respect to depreciation of intangibles. However, petitioner is not required to use the straight-line method if its use does not produce a reasonable allowance for the exhaustion of the acquired core deposits intangible, KIRO, Inc. v. Commissioner, 51 T.C. 155, 168 (1968); and petitioner can show that another method results in a more reasonable allowance. Citizens & Southern, Corp. v. Commissioner, supra at 512; Computing & Software, Inc. v. Commissioner, 64 T.C. at 237-238.See also Union Bankers Insurance Co. v. Commissioner, 64 T.C. 807 (1975) (Court allowed depreciation over 7 years with a 20 percent deduction in first year upon factual showing that reinsurance contracts had 7-year useful life and at least 20 percent of them would be lost in first year). A method other than straight-line is appropriate when, considering the facts of the case, it "results in a fair allocation of the basis of the asset to periods in which income is realized and gives * * * a reasonable allowance for amortization." Schneider v. Commissioner, 65 T.C. 18, 32 (1975). Petitioner contends that its tax method of depreciation *631 coincides with the evidence and the facts of life in the banking industry. The evidence establishes that deposit base declines rapidly in value during the years immediately following acquisition because of the pattern of account closures and because of discounting. Petitioner used an accelerated depreciation method because E & W projected that the rate of decline in the acquired core deposits balances was greater in the earlier years than the later years. Petitioner argues that its accelerated method was reasonable and warranted by the rapid decline in value of core deposits in earlier years. Such a method was approved in Citizens & Southern, Corp. v. Commissioner, 91 T.C. at 512. The taxpayer in Citizens & Southern used different amortization schedules for financial and tax accounting purposes. 91 T.C. at 473-74. There the method used for financial accounting purposes yielded lower depreciation expenses in earlier years, thus reflecting higher income on the financial statements. However, for tax accounting purposes, the taxpayer used a method resulting in higher depreciation deductions in the earlier years, thus reducing taxable income more than the reduction in accounting income *632 for those years. In contrast, petitioner used the same amortization schedules for financial, regulatory, and tax accounting purposes because those schedules accurately reflected and matched petitioner's income and depreciation costs associated with the various acquired core deposits intangible. Petitioner reviewed the accounts that were in existence at the time of the bank acquisitions at several post-acquisition dates to determine how closely the actual termination of core deposit accounts corresponded to the amortization of the acquired core deposits intangible. Year by year, the actual percentage of accounts remaining varied only slightly from the projected remaining values of core deposits intangible. Petitioner's actual cumulative amortization deduction tracks closely (within 2 1/2 percent) the actual cumulative decline in number of accounts closed with the acquired banks. The close correlation of the actual terminations of acquired core deposit accounts to the loss in value of acquired core deposits intangible projected by petitioner supports the reasonableness of its amortization schedules. Citizens & Southern Corp. v. Commissioner, supra at 500. Respondent argues that petitioner *633 has not met its burden of proving that it is entitled to use a method of depreciation other than straight-line because its lifing studies were flawed and inadequate to show that straight-line produces an unreasonable allowance. Respondent claims that petitioner failed to demonstrate the correlation between the obsolescence of its core deposits intangible and the deductions it computed, and that in fact, petitioner's valuation and lifing studies suggest that the period of obsolescence of core deposits intangible extends well beyond the period over which the entire computed value of core deposits intangible was deducted. Respondent concludes that petitioner's method did not result in a "fair allocation of the asset to periods in which income is realized," as required by this Court. Citizens & Southern Corp. v. Commissioner, supra at 512; Schneider v. Commissioner, 65 T.C. 18, 32 (1975). We hold that petitioner's depreciation method produced reasonable allowances for the exhaustion of its core deposits intangible. In light of our holding that petitioner is entitled to allocate to core deposits intangible the present value of the difference in costs between the acquired core deposits *634 and the market alternative, petitioner's depreciation deduction should be calculated based upon the present value on the acquisition dates of such difference for the taxable year. The precise amount of petitioner's depreciation deductions can be determined in the parties' Rule 155 computation. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Arvada was acquired on February 1, 1981. On November 15, 1982, petitioner made an election under section 338 to treat the purchase of the Arvada stock as an asset purchase. ↩
2. Purchase price adjusted as of November 15, 1982, for interim earnings and profits. The actual purchase price paid on the date of purchase, February 1, 1981, was $ 8,135,700.
3. "Five Banks" is the term used to refer to the five banks (Aurora, Boulder, Ft. Collins, Park, and Pueblo) petitioner purchased from MBL.↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. In addition to purchasing all of the outstanding stock of Aurora Mountain Bank, Colorado National Bank of Aurora acquired certain real property upon which Aurora Mountain Bank is located.↩
6. The average daily balance was used for the corporate and personal demand deposit accounts of the Five Banks and Exchange, the corporate demand deposit accounts at Arvada, the NOW accounts at Aurora, Pueblo and Park, and the corporate and personal savings accounts at Boulder and Ft. Collins. The current balance was used for the personal demand deposit accounts at Arvada, the NOW accounts at Arvada, Boulder, Ft. Collins and Exchange, and the corporate and personal savings accounts at Arvada, Aurora, Exchange, Park, and Pueblo.
7. The Federal Reserve Functional Cost Analysis Report is an annual survey regarding various financial data of approximately 700 banks, which categorizes the results by region and size to provide a more accurate basis for comparability.
*. With respect to the NOW accounts at Exchange, no separate figure for service charge income was listed. Rather, the amount of service charge income per account was offset against the cost of servicing an account to arrive at a net cost of servicing of $ 71.64.↩
*. With respect to the NOW accounts at Exchange, no separate figure was listed for costs of servicing accounts. Rather, the amount of account servicing costs was offset against the service charge income generated, yielding a net cost of servicing of $ 71.64.↩
*. E & W calculated the value of the core deposits intangible associated with the Boulder demand deposit and NOW accounts based on a life of five years.↩
*. In Exhibit 95, a revenue rate of 13 percent was mistakenly used for Pueblo instead of the correct rate of 11 percent. If the correct revenue rate of 11 percent is used, the value of petitioner's acquired core deposits intangible associated with Pueblo is $ 11,421,718.54.↩
8. See also APB Opinion No. 16, "Business Combinations," (August 1970).↩
*. E & W calculated the value of the core deposits intangible associated with the Boulder DDA and NOW accounts based on a life of five years.↩
9. Sec. 1060, enacted by sec. 641(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2282, makes the residual method of valuation mandatory for acquisitions after May 6, 1986, unless entered under a binding contract in effect on that date and at all times thereafter.↩